UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

JAMALIN PATRICIA MORRIS,

                                          Plaintiff,

                    -against-

KIRSTJEN M. NIELSEN, in her official capacity as
Secretary of Homeland Security; LEE FRANCIS
CISSNA, in his official capacity as Director of
United States Citizenship and Immigration Services;
and LAURA ZUCHOWSKI, in her official capacity
as Director of the Vermont Service Center of United
States Citizenship and Immigration Services,

                                          Defendants.
---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**17-CV-04001 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

This case arises out of United States Citizenship and Immigration Services' ("USCIS")

denial of Plaintiff Jamalin Patricia Morris's petition for U nonimmigrant status pursuant to 8

U.S.C. § 1101(15)(U). Plaintiff has moved for summary judgment, and Defendants have moved

to dismiss Plaintiff's complaint or, in the alternative, for summary judgment. (See Defs. Mot

(Dkt. 26); Mem. in Supp. of Defs. Mot. ("Defs. Mem.") (Dkt. 27); Pl. Mot. (Dkt. 28); Defs.

Reply in Supp. of Defs. Mot. ("Defs. Reply") (Dkt. 29); Pl. Reply in Opp'n to Mot. ("Pl. Reply")

(Dkt. 30).) For the following reasons, Plaintiff's motion for summary judgment is GRANTED,

and Defendants' motion to dismiss, or, in the alternative, for summary judgment is DENIED.

## I.     BACKGROUND

### A.     Facts

The underlying facts are not in dispute.

### 1. Plaintiff and Her Daughter's Murder

Plaintiff is a non-citizen who entered the United States on a visitor's visa in 1998. (Redacted Compl. ("Compl.") (Dkt. 8-1) ¶ 19.) Until August 30, 2007, Plaintiff lived in Brooklyn, New York, with her daughter Tricia, Tricia's two children (A.M. and R.R.), and Plaintiff's younger daughter Samantha. (Id.) According to Plaintiff, she and Tricia "maintained an extremely close relationship." (Id. ¶ 20.) Tricia was Plaintiff's "best friend and only source of emotional support." (Id.) Additionally, both women relied on each other "to take care of their children": Tricia would often look after Samantha, while Plaintiff would help take care of A.M. and R.R. (Id.) Plaintiff states that A.M. and R.R. would call their grandmother "mommy." (Id.) A.M. and R.R.'s father, Arlington Marshall ("Arlington"), allegedly did not take care of them. (Id.)

On August 30, 2007, Tricia and A.M. visited Arlington's home. (Id. ¶ 21.) While there, Arlington and Tricia got into an argument. (Id.) As the argument intensified, Arlington locked himself, Tricia, and A.M. in the bedroom. (Id.) Arlington then shot Tricia twice in the head and then shot himself. (Id.) A.M. witnessed both shootings. (Id.) When neighbors broke into the room and found Tricia and Arlington dead, A.M. was crying on the floor. (Id.)

The police called Plaintiff and informed her that A.M. was at a police station in the Bronx. (Id. ¶ 22.) Police officers picked Plaintiff up and brought her to the police station, where they informed her that Tricia had been killed. (Id.) Plaintiff brought A.M. home from the police station. (Id.) Since that date, Plaintiff has been A.M. and R.R.'s sole parental figure, and she has been their legal guardian since December 5, 2007. (Id.) As a result of Tricia's murder, Plaintiff "has experienced substantial mental pain." (Id. ¶ 23.) She claims to suffer from chronic, severe

posttraumatic stress disorder ("PTSD") as well as from symptoms of depression and severe anxiety. (Id.)

        2.    <u>Plaintiff's Petition for U-Visa Status</u>

On April 19, 2013, Plaintiff filed a petition for U nonimmigrant status (the "Petition"). (Id. ¶ 24.) U nonimmigrant status, otherwise referred to as a "U visa," is a temporary legal status "set aside for victims of certain crimes who have suffered mental or physical abuse and provide assistance to investigations or prosecution of criminal activity." <u>Argueta Anariba v. Shanahan</u>, 190 F. Supp. 3d 344, 346 (S.D.N.Y. 2016). The Petition stated that Plaintiff was qualified for a U visa as a "victim of qualifying criminal activity" that caused her "substantial mental abuse," and that she had provided helpful information to law enforcement. (Compl. ¶ 5.) The Petition included a U nonimmigrant status certification ("Supplement B") signed by the Immigration Services Coordinator for the New York City Administration for Children's Services certifying that Plaintiff was a victim and identifying two crimes for which Plaintiff had provided helpful information to law enforcement: child endangerment of A.M. and the murder of Tricia. (Id. ¶ 24.) On May 12, 2014, Plaintiff submitted a supplemental response following a request for additional materials from USCIS. (Id.) Those additional materials included an affidavit from Plaintiff detailing her "substantial mental suffering due to her daughter's murder and her role as A.M.'s sole provider of parental care" and an affidavit signed by Jennifer H. McQuaid, a clinical psychologist, attesting to the emotional harm suffered by Plaintiff as a result of Tricia's murder. (Id.)

On December 18, 2014, the Director of the USCIS Vermont Service Center denied Plaintiff's Petition (the "Denial Letter"). (Id. ¶ 25.) The Denial Letter stated that Plaintiff could not be a direct victim of the qualifying criminal activity because she was not physically present

at the time of Tricia's murder. (Id.) USCIS re-mailed the Denial Letter to Plaintiff on June 10,

2015, after originally sending it to the wrong address. (Id.; July 10, 2015, Notice of Appeal (AR

at 41).) Plaintiff filed an appeal from the Denial Letter with USCIS's Administrative Appeals

Office (the "AAO") on July 10, 2015. (Compl. ¶ 26.) The AAO denied Plaintiff's appeal on

October 10, 2016, "for largely the same reasons that USCIS provided in the Denial Letter" (the

"AAO Decision"). (Id.) It also stated that she did not qualify as an indirect victim of child

endangerment because a legal guardian does not qualify as a parent. (Id. ¶ 49.)

**B.  Procedural History**

Plaintiff filed her complaint with this court on July 5, 2017, seeking declaratory judgment

and attorneys' fees and costs. (Compl.) The complaint alleges that the AAO Decision is

arbitrary and capricious in violation of the Administrative Procedure Act (the "APA") because it

(1) "reads a new requirement of physical presence into an agency's determination of direct and

proximate harm" and (2) "failed to consider the evidentiary record in determining whether

[Plaintiff] had been proximately harmed." (Id. ¶ 56.) The complaint also challenges the

conclusions that Plaintiff could not be an indirect victim of the qualifying crime because she was

not A.M.'s legal guardian at the time of the crime and was not in a parent-child relationship with

A.M. (Id.)

Within two months of filing her complaint, Plaintiff sought leave to move for summary

judgment; a month later, Defendants sought leave to move to dismiss Plaintiff's complaint or, in

the alternative, cross-move for summary judgment. (See Aug. 30, 2017 Letter (Dkt. 12); Oct. 12,

2017 Letter (Dkt. 15).) The court granted both sides leave to file their cross-motions and ordered

a briefing schedule. (See Oct. 20, 2017 So-Ordered Briefing Schedule (Dkt. 17).) Following

4

numerous extensions of time, the cross-motions were fully briefed on March 22, 2018. (See Defs. Mot.; Defs. Mem.; Pl. Mot.; Defs. Reply; Pl. Reply.)

In support of her motion for summary judgment, Plaintiff argues that the AAO's decision was arbitrary and capricious in violation of the APA and that USCIS's interpretation of the U-visa regulations does not warrant deference. (See Pl. Mot.) Defendants, on the other hand, argue that USCIS's interpretation is permissible and entitled to deference, and that USCIS's ultimate determination was correct. (See Defs. Mem.)

## II.     LEGAL STANDARD

### A.     Motion to Dismiss

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). In reviewing a complaint, the court must accept all allegations of fact as true, and must draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678. "[M]ere 'labels and conclusions' or 'formulaic recitation[s] of the elements of a cause of action'" are insufficient; "the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (emphasis in original) (quoting Twombly, 550 U.S at 555).

**B.**     **Summary Judgment**

A court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where, as here, 'a court is called upon to review agency action under the APA, the question presented is a legal one which the district court can resolve on the agency record on a motion for summary judgment.'" City Club of New York v. U.S. Army Corps of Eng'rs, 246 F. Supp. 3d 860, 864 (S.D.N.Y. 2017) (quoting Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev., 116 F. Supp. 3d 251, 275-76 (S.D.N.Y. 2015), aff'd, 802 F.3d 413 (2d Cir. 2015)).

## III.     DISCUSSION

**A.**     **Statutory and Regulatory Background**

On October 28, 2000, Congress enacted the Victims of Trafficking and Violence Protection Act of 2000 (the "VTVPA"), Pub. L. 106-386, 114 Stat. 1464 (2000). Among other provisions, the VTVPA amended the Immigration and Nationality Act (the "INA") and created the U visa. See id. § 1513(b) (codified at 8 U.S.C. § 1101(15)(U)). In enacting the U-visa provisions, Congress sought "to strengthen the ability of law enforcement agencies to investigate and prosecute such crimes as domestic violence, sexual assault, and trafficking in persons, while offering protection to alien crime victims . . . ." New Classification for Victims of Criminal Activity, 72 Fed. Reg. 53,014, 53,014 (Sept. 17, 2007); accord Baiju v. U.S. Dep't of Labor, No. 12-CV-5610 (KAM), 2014 WL 349295, at *6 (E.D.N.Y. Jan. 31, 2014); see VTVPA § 1513(a)(2)(A); see also United States v. Cisneros-Rodriguez, 813 F.3d 748, 762 (9th Cir. 2015) ("Congress's purpose in establishing the U-visa was to protect '[a]ll women and children who are victims of [qualifying] crimes,' not merely those who have information or assistance to

provide regarding high-profile crimes." (alterations in original) (quoting VTVPA §
1513(a)(1)(B))).  A non-citizen "who is granted [a U visa] can remain in the United States for up
to four years, with possible extensions, and may apply for permanent resident status after three
years."  Baiju, 2014 WL 349295, at *6.

There are two classes of individuals eligible for U visas: direct victims and indirect
victims.  An individual is eligible for a U visa as a direct victim if she has "suffered substantial
physical or mental abuse as a result of having been a victim" of a qualifying criminal activity and
if she "possesses information concerning" the qualifying criminal activity.  8 U.S.C. §
1101(a)(15)(U)(i)(I)-(II).  The statute does not define who a "victim" of a qualifying criminal
activity may be, but the U.S. Department of Homeland Security ("DHS") U-visa regulations
define a victim as "an alien who has suffered direct and proximate harm as a result of" the
criminal activity.  8 C.F.R. § 214.14(a)(14).  The U-visa regulations do not define "direct and
proximate harm."  (See Defs. Mem. at 13-14.)

The statute's "physical or mental abuse" requirement is met if the petitioner has sustained
"injury or harm to [her] physical person, or harm to or impairment of [her] emotional or
psychological soundness."  8 C.F.R. § 214.14(a)(8).  Several factors are relevant in determining
whether such harm is "substantial":

> The nature of the injury inflicted or suffered; the severity of the perpetrator's
> conduct; the severity of the harm suffered; the duration of the infliction of the harm;
> and the extent to which there is permanent or serious harm to the appearance,
> health, or physical or mental soundness of the victim, including aggravation of pre-
> existing conditions.

Id. § 214.14(b)(1).  No single factor is dispositive in this analysis.  Id.

A direct victim's "alien spouse, children under 21 years of age and, if the direct victim is
under 21 years of age, parents and unmarried siblings under 18 years of age" may obtain U-visa
status as indirect victims if "the direct victim is deceased due to murder or manslaughter, or is

7

incompetent or incapacitated." Id. § 214.14(a)(14)(i). USCIS will consider the age of the direct victim at the time of the crime in determining whether she was incompetent. Id. The purpose of including such indirect victims was to ensure the cooperation of family members, who are likely to be well suited to assist law enforcement when the direct victim is unable to do so. See New Classification for Victims of Criminal Activity, 72 Fed. Reg. at 53,016 ("Family members of [eligible] victims frequently have valuable information regarding the criminal activity that would not otherwise be available to law enforcement officials . . . . By extending the victim definition to include certain family members of [eligible] victims, the rule encourages these family members to fully participate in the investigation or prosecution.")

**B.    Standard of Review**

Under the APA, federal courts have jurisdiction to review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In reviewing agency determinations, courts employ "a deferential standard, under which such actions may only be disturbed if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or [are] 'unsupported by substantial evidence.'" Glara Fashion, Inc. v. Holder, 11-CV-889 (PAE), 2012 WL 352309, at *6 (S.D.N.Y. Feb. 3, 2012) (quoting 5 U.S.C. § 706(2)(A), (E)).

As the Supreme Court has made clear:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter . . . . [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Chevron, U.S.A., Inc. v. Nat. Res. Def. Counsel, Inc., 467 U.S. 837, 842-43 (1984). In other words, "[i]f the agency interpretation is not in conflict with the plain language of the statute,

deference is due." Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp., 503 U.S. 407, 417 (1992)

(citing K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 292 (1988)).

Similarly, a court grants deference to an agency interpretation of its own regulation

"unless [it] is 'plainly erroneous or inconsistent with the regulation'" or there is "reason to

suspect that the interpretation does not reflect the agency's fair and considered judgment on the

matter in question." Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 208-09 (2011) (quoting

Auer v. Robbins, 519 U.S. 452, 461, 462 (1997)); accord Mullins v. City of New York, 653 F.3d

104, 106 (2d Cir. 2011) (citing Talk Am., Inc. v. Mich. Bell Tel. Co., 564 U.S. 50, 59 (2011)).

"'[T]he agency's interpretation need not be the best or most natural one by grammatical or other

standards.'" Linares Huarcaya v. Mukasey, 550 F.3d 224, 229 (2d Cir. 2008) (alteration

adopted) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991)). "Rather, the

agency's view need be only reasonable to warrant deference." Id. (quoting Pauley, 501 U.S. at

702). Thus, the court must defer to the agency's construction "unless an 'alternative reading is

compelled by the regulation's plain language or by other indications of the [agency's] intent at

the time of the regulation's promulgation.'" Thomas Jefferson Univ. v. Shalala, 512 U.S. 504,

512 (1994) (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)).

However, the court should only defer to an agency's interpretations of its own regulations

"when the language of the regulation is ambiguous." Christensen v. Harris County, 529 U.S.

576, 588 (2000); see McCoy, 562 U.S. at 211 ("[I]f the text of a regulation is unambiguous, a

conflicting agency interpretation . . . will necessarily be 'plainly erroneous or inconsistent with

the regulation' in question." (quoting Auer, 519 U.S. at 461)). A regulation is ambiguous when

it is readily capable of being understood in two or more ways. Cf. Chicksaw Nation v. United

States, 534 U.S. 84, 90 (2001) (a statute is ambiguous when it is "'capable of being understood

in two or more possible senses or ways.'" (quoting Ambiguous, Webster's Ninth New Collegiate Dictionary (1985)).  In determining whether a regulation is ambiguous, courts should look to the text of the regulation itself as well as "the legal context in which the [agency] issued its regulation." Halo v. Yale Health Plan, Dir. of Benefits & Records Yale Univ., 819 F.3d 42, 53 (2d Cir. 2016) (holding that the district court had improperly failed to consider the context in which the regulation was passed when determining its unambiguous meaning).  The court "look[s] to the plain language of the regulatory text, which [the court] consider[s] 'in light of its purpose, as stated in the regulation's preamble as well as the purpose of the regulation's authorizing statute.'" Fernandez v. Zoni Language Ctrs., Inc., 858 F.3d 45, 50 (2d Cir. 2017) (citing Halo, 819 F.3d at 52 (2016) (alteration adopted)).

    **C.**    **Application**

        1.    Direct victim

In denying Plaintiff's petition, USCIS interpreted the phrase "direct and proximate harm" in the U-visa regulations as requiring a victim to have been physically present at the crime scene.[1]  (See Defs. Mem. at 4.)  The regulation simply will not bear that meaning.

        *a.*    *"Direct and Proximate" is Unambiguous*

Defendants seem to argue that, because the phrase "direct and proximate harm" is not defined, it must be ambiguous.  (See Defs. Mem. at 13-14 ("The U visa regulations . . . do not define 'direct and proximate harm,' as Plaintiff concedes in the complaint.  Thus, the regulation is silent and ambiguous with respect to the definition of 'direct and proximate harm.'" (citation

---

[1] The court treats the AAO decision as the final agency action for purposes of APA review, see Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" (quoting 5 U.S.C. § 704)), and looks to that decision to determine how the agency interpreted the U-visa regulations in this case.

omitted).) But it cannot be the case that every undefined word or phrase in a regulation is necessarily ambiguous. Cf. Emergency Servs. Billing Corp., Inc. v. Allstate Ins. Co., 668 F.3d 459, 466 (7th Cir. 2012) ("'The lack of a statutory definition,' however, 'does not render a term ambiguous.'" (quoting Am. Fed'n of Gov't Employees v. Glickman, 215 F.3d 7, 10 (D.C. Cir. 2000)). An agency might reasonably choose not to define a word or phrase with a commonly accepted meaning, whether that meaning comes from ordinary usage or from an established legal understanding.

And when a regulation uses a phrase or word with an established legal meaning—a legal "term of art"—courts should assume the regulation incorporates that meaning absent evidence to the contrary. Cf. Molzof v. United States, 502 U.S. 301, 305-06 (1992) (holding that the Federal Tort Claims Act's use of "punitive damages" unambiguously adopted the established legal meaning of the phrase because "'[p]unitive damages is a legal term of art that has a widely accepted common-law meaning . . . . Although the precise nature and use of punitive damages may have evolved over time, and the size and frequency of such awards may have increased, this Court's decisions make clear that the concept of 'punitive damages' has a long pedigree in the law."); Sullivan v. Stroop, 496 U.S. 478, 483 (1990) (holding that, in the context of the Social Security Act, "child support" is a term of art with an established legal meaning and that the statute unambiguously incorporated that meaning because it "show[ed] no intent to depart from common usage"). When courts determine the meaning of a regulation, they apply the same techniques as in "the analogous context of statutory construction." Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 53 (D.C. Cir. 1999) (discussing principles for considering the preamble of a statute in interpreting that statute, and noting that "[t]he principles governing interpretation of the preamble of a regulation are no different"); see also Flores-Chavez v.

Ashcroft, 362 F.3d 1150, 1158 (9th Cir. 2004) (applying statutory interpretive techniques to the interpretation of a regulation). And "[i]t is a 'cardinal rule of statutory construction' that, when Congress employs a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.'" F.A.A. v. Cooper, 566 U.S. 284, 292 (2012) (quoting Molzof, 502 U.S. at 307).[2] The logic of that "cardinal rule" transfers fully to the parallel context of regulatory interpretation.

And the phrase at issue here, "direct and proximate," is a term of art with "a long pedigree in the law," Molzof, 502 U.S. at 306. According to Black's Law Dictionary, a direct and proximate cause is "[a] cause that is legally sufficient to result in liability" or, alternatively, "[a] cause that directly produces an event and without which the event would not have occurred." Proximate Cause, Black's Law Dictionary, (10th ed. 2014) (listing "direct and proximate cause" as carrying the same meaning as "proximate cause"). The phrase has appeared in every edition of Black's Law Dictionary—with substantially the same definition—since 1979. See Direct and Proximate Cause, Black's Law Dictionary, (9th ed. 2009); Direct and Proximate Cause, Black's Law Dictionary, (8th ed. 2004); Direct and Proximate Cause, Black's Law Dictionary, (7th ed. 1999); Direct Cause and Proximate Cause, Black's Law Dictionary, (5th ed. 1979).

The phrase has also appeared, used in the same way, in caselaw dating back to the 19th century. See Lynn Gas & Electric Co. v. Meriden Fire Ins. Co., 33 N.E. 690, 691 (Mass. 1893) ("The active, efficient cause that sets in motion a train of events which brings about a result

---

[2] This interpretive rule applies to phrases used in other statutes, see Shannon v. United States, 512 U.S. 573, 581 (1994) ("[W]henever Congress has borrowed from the statutes of a State provisions which had received in that State a known and settled construction before their enactment by Congress, that construction must be deemed to have been adopted by Congress together with the text which it expounded, and the provisions must be construed as they were understood at the time in the State." (quoting Capital Traction Co. v. Hof, 174 U.S. 1, 36 (1899) (alteration adopted)), and to phrases with an established meaning at common law, see, e.g., Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739-40 (1989) (relying on traditional common law agency principles for meaning of term "employee"); Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992) (following the same course after finding ERISA's "circular" definition of "employee" to be wanting).

without the intervention of any force started and working actively from a new and independent source is the direct and proximate cause."); see also Frontier Ins. Co. v. Merritt & McKenzie, Inc., 73 N.Y.S.3d 267, 270-71 (N.Y. App. Div. 2018) (for the plaintiff to successfully establish that the "defendant's conduct was the direct and proximate cause of its [damages]," the plaintiff "was required to prove that any alternative causes were sufficiently remote to permit the factfinder to base a determination in its favor on logical inferences from the evidence rather than speculation" (citations omitted and alterations adopted)); Edwards ex rel. Fryover v. Anderson Engineering, Inc., 251 P.3d 660, 664 (Kan. Ct. App. 2011) (noting that, in order to show that an injury is "a direct and proximate result of a defendant's negligence," the plaintiff must show that the defendants' actions, "in natural and continuous sequence, unbroken by an efficient intervening cause, produce[d] the injury, and without which the injury would not have occurred, the injury being the natural and probable consequences of the wrongful act" (internal quotation marks and citations omitted)); Marshall Produce Co. v. St. Paul Fire & Marine Ins. Co., 98 N.W.2d 280, 290 (Minn. 1959) (adopting Lynn's definition of "direct and proximate cause," as quoted in Jiannetti v. Nat'l Fire Ins. Co., 277 Mass. 434, 438 (1931)); Cook v. Cont'l Ins. Co., 220 Ala. 162, 164 (1928) (approvingly quoting Lynn's definition of "direct and proximate cause").

Even when the phrase "direct and proximate" is not followed by "cause," it retains the same well-established meaning. For example, "direct and proximate damages" have long referred to damages flowing naturally from an event; in other words, "[t]he question always is, was there an unbroken connection between the act and the injury,—a continuous operation?" Lersner v. McDonald, 38 Misc. 734, 735-36 (N.Y. App. Div. 1902). Throughout the nation, and for over a century, this meaning has remained constant. See, e.g., Nat'l Market Share, Inc. v.

13

Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004) ("One who violates his contract with

another is liable for all the direct and proximate damages which result from the violation. . . .

[D]amages may be so remote as not to be directly traceable to the breach, or they may be the

result of <u>other intervening causes</u>, and then they cannot be allowed." (quoting <u>Wakeman v.

Wheeler & Wilson Mfg. Co.</u>, 4 N.E. 264, 266 (N.Y. 1886) (emphasis in original)); <u>Wells v. Nat'l

Life Ass'n of Hartford</u>, 99 F. 222, 232 (5th Cir. 1900) ("[D]irect and proximate damages . . .

must be not merely speculative, possible, or imaginary, but they must be reasonably certain . . . .

They may be so remote as not to be directly traceable to the breach, or they may be the result of

other intervening causes, and then they cannot be allowed." (citation omitted)); <u>Fenton v. Price</u>,

145 Ark. 116, 116 (1920) (in an action for breach of contract, "direct and proximate damages . . .

must flow directly and naturally from the breach of the contract" and "must not be remote");

<u>O'Neill v. Johnson</u>, 53 Minn. 439, 442 (1893) (stating that damages that "are too remote and

speculative" are not "direct and proximate damages" because "[w]hether [the harm] was a result

of the [defendant's actions] must necessarily be arrived at by conjecture and speculation"). The

phrase "direct and proximate," then, has consistently meant the same thing for over a century.

And, as the Supreme Court once observed about punitive damages, the exact contours of "direct

and proximate" may have moved slightly over time and geography, but the phrase nonetheless

retains its widely accepted common law meaning. <u>See</u> <u>Cooper</u>, 566 U.S. at 292 (quoting <u>Molzof</u>,

502 U.S. at 307).

Moreover, the same or a very similar phrase appears in multiple federal statutes, and is

uniformly understood consistent with its preexisting common law definitions. Most relevant

here, the Crime Victims' Rights Act of 2004 (the "CVRA") defines a "crime victim" as "a

person <u>directly and proximately harmed</u> as a result of the commission of a Federal offense," 18

U.S.C. § 3771(e)(2)(A) (emphasis added), and the Mandatory Victim Restitution Act of 1996

(the "MVRA") defines a "victim" as "a person <u>directly and proximately harmed</u> as a result of the

commission of an offense." 18 U.S.C. § 3663A(a)(2) (emphasis added).[3]  In both the CVRA and

the MVRA,[4] courts uniformly interpret the phrase "directly and proximately harmed" as

"encompass[ing] the traditional 'but for' and proximate cause analyses." <u>In re Rendon Galvis,</u>

564 F.3d 170, 175 (2d Cir. 2009) (discussing the phrase in the CVRA context) (citing <u>In re</u>

<u>Antrobus,</u> 519 F.3d 1123, 1126 (10th Cir. 2008) (Tymkovich, J., concurring); <u>United States v.</u>

<u>Sharp,</u> 463 F. Supp. 2d 556, 567 (E.D.Va. 2006)).  <u>See also</u> <u>In re Fisher,</u> 640 F.3d 645, 648 (5th

Cir. 2011) (discussing the CVRA and holding that "[a] person is directly harmed by the

commission of a federal offense where that offense is a but-for cause of the harm.  A person is

proximately harmed when the harm is a reasonably foreseeable consequence of the criminal

conduct."); <u>In re McNulty,</u> 597 F.3d 344, 350 (6th Cir. 2010) (adopting the same definition in the

CVRA context).  <u>See also</u> <u>United States v. Clark,</u> 787 F.3d 451, 463 (7th Cir. 2015) (holding

that, under the MVRA, "[d]irect and proximate harm means that the loss would not have

occurred 'but for' the offense and that it was 'foreseeable'"); <u>United States v. Speakman,</u> 594

F.3d 1165, 1171 (10th Cir. 2010) ("[T]o show that one is a victim under the MVRA, the

---

[3] The phrase "direct and proximate" appears in other federal statutes as well.  For example, the Public Safety Officer's Benefits Act ("PSOBA") instructs the Bureau of Justice Assistance ("BJA") to provide benefits to officers who are disabled as a "direct and proximate result" of an injury sustained in the line of duty.  34 U.S.C. § 10281(b).  BJA's implementing regulations define a "direct and proximate result" of an injury as something that "the injury is a substantial factor in bringing . . . about."  28 C.F.R. § 32.3.  A "substantial factor" is further defined as a factor that "alone was sufficient" to cause the injury or a factor causing an injury where "no other factor (or combination of factors) contributed to the [injury] to so great a degree as it did."  <u>Id.</u>  This definition is consistent with the broader legal understanding of "direct and proximate."

[4] "[F]ederal courts of appeals throughout the United States have held that, given the similarity between the statutory text of the CVRA and the VWPA, a 'victim' under the VWPA is the same as a 'crime victim' under the CVRA."  <u>United States v. Credit Suisse AG,</u> No. 14-CR-188, 2014 WL 5026739 at *3 (E.D.Va. Sept. 29, 2014) (collecting cases).  Further, Senator Jon Kyl, one of the CVRA's chief sponsors, has asserted that "[t]he CVRA's definition of a crime victim is based on the federal restitution statutes."  The Honorable Jon Kyl, et al., <u>On the Wings of Their Angels: The Scott Campbell, Stephanie Roper, Wendy Preston, Louarna Gillis, and Nila Lynn Crime Victims' Rights Act,</u> 9 Lewis & Clark L. Rev. 581, 594 (2005) (citing the MVRA).

15

government must show both that the defendant's conduct is the 'but-for' cause of the individual's harm and that the defendant 'proximately' caused the harm.") In both of these statutes, the phrase is interpreted consistently with its common law usage: as referring to harm caused by a specific crime where that crime "directly produces [the harm] and without [that crime] the [harm] would not have occurred." See Proximate Cause, Black's Law Dictionary, (10th ed. 2014) (listing "direct and proximate cause" as carrying the same meaning as "proximate cause"). [5]

The phrase direct and proximate has thus been defined consistently for over a hundred years, in both common and federal statutory law. And, crucially, this meaning had long been established—in the CVRA and MVRA contexts as well as in common law—by the time DHS enacted the U-visa regulations in September of 2007. See United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002) (stating that, to show someone was directly and proximately harmed under the MVRA, the "government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal connection between the conduct and the loss is not too attenuated") (emphasis added) (citation omitted); see also United States v. Robertson, 493 F.3d 1322, 1334 (11th Cir. 2007) (adopting Cutter's definition of "directly and proximately harmed"); United States v. Donaby, 349 F.3d 1046, 1053 (7th Cir. 2003) (same); United States v. Gamma Tech. Indus., Inc., 265 F.3d 917, 928 (9th Cir. 2001) (describing the "directly and proximately harmed" standard as one in which the "[d]efendant's

---

[5] "Of course, the meaning an agency attaches to a term in its regulations is not always the same as the meaning Congress intends to give that term when Congress includes it in statutes. But an agency's use of a term can be valuable information not only about ordinary usage but also about any specialized meaning that people in the field attach to that term. That is particularly true when, as here, the term is one that the agency uses in a number of contexts." Loving v. I.R.S., 742 F.3d 1013, 1017 (D.C. Cir. 2014) (using a term used in a regulation to help understand the meaning of that term when used in a later-enacted statute). The logic applies in the other direction as well—although a meaning could, of course, vary, Congress's use of the term provides "valuable information" to the court about both the "ordinary usage" and "specialized meaning" of the phrase "direct and proximate harm."

conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss . . . must be directly related to the defendant's conduct. The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable." (citations omitted)).

Thus, the definition of "direct and proximate" draws on a long-established heritage of a consistent legal understanding. Further, according to its own preamble, the U-visa regulations took the phrase directly from federal statutes, including the MVRA and the CVRA. See New Classification for Victims of Criminal Activity, 72 Fed. Reg. at 53,016. Since, when interpreting a regulation, courts look to "'its purpose, as stated in the regulation's preamble,'" Fernandez, 858 F.3d at 50 (citing Halo, 819 F.3d at 52 (2016) (alteration adopted)), that citation helps solidify what a reading of the text alone already demonstrates: that the regulation unambiguously incorporates the established legal meaning of the phrase "direct and proximate." To interpret the phrase inconsistently with its legal heritage would be to ignore common sense, established legal practice, and the drafters of the U-visa regulations themselves.

Defendants argue that "examples of how 'direct and proximate harm' is interpreted in other statutes are . . . inapposite here, because those other contexts defined 'victim' generally without reference to direct and indirect victims." (Defs. Reply at 12). Defendants do not explain, however, how that interpretation fits with the preamble to the U-visa regulations— which they insist USCIS "consider[ed]" and from which they extensively quote other language (Defs. Reply at 11). The preamble explains: "To formulate the general definition [of victim], USCIS drew from established definitions of 'victim.' Federal statutory provisions consistently define 'victim' as one who has suffered direct harm or who is directly and proximately harmed as a result of the commission of a crime." New Classification for Victims of Criminal Activity, 72 Fed. Reg. at 53,016 (citing, inter alia, the MVRA and the CVRA).

As an alternative, Defendants point to the Attorney General's Guidelines for Victim and

Witness Assistance (the "AG Guidelines")—also cited in the preamble—as laying out a

different, more restrictive definition of victim.[6] (Defs. Reply at 13.) However, as the preamble

notes, the definition in the AG Guidelines is "similar" to the one laid out by the federal statutes

cited in the preamble (including the CVRA and the MVRA). See New Classification for Victims

of Criminal Activity, 72 Fed. Reg. at 53,016. The preamble further quotes the AG Guidelines

for the proposition that "individuals whose injuries arise only indirectly from an offense" are not

victims. Id. Of course that is true: if an individual's injuries arise indirectly from a crime, they,

by definition, cannot have been directly and proximately harmed by the crime. This does not

alter the court's analysis, however, because someone who has been directly and proximately

harmed is not "only indirectly" harmed by the crime, whether present at the scene or not.

Defendants also rely heavily on the preamble reference to a "bystander" as a potential

victim, and point to the example given of a non-targeted individual as a victim—a pregnant

woman miscarrying after witnessing a violent crime. (See Defs. Mem. at 15-16, 16 n.6.) It is

true that this example involves both substantial physical injury and physical presence at the scene

of the crime. The weight of such an example in a preamble, however, is insufficient to overcome

the clearly established meaning of "direct and proximate" as laid out above. While the preamble

to a regulation is persuasive evidence of a regulation's purpose, it is not part of the regulation.

See Halo, 819 F.3d at 52-53 (adopting the proposition that "the preamble to a regulation is

evidence of an agency's contemporaneous understanding of its proposed rules," but "language in

the preamble of a regulation is not controlling over the language itself" (quoting Wyo. Outdoor

---

[6] The preamble cites to the 2005 version of the AG Guidelines, which have since been updated. Unless noted otherwise, the court uses "AG Guidelines" to refer to the 2005 version of the guidelines (as that was the current edition when the U-visa regulations were promulgated in 2007).

Council, 165 F.3d at 53)). The role of a preamble is different from that of the regulation's text: it illustrates, in a broad sense, the intent of the drafters. And while the given example helps illustrate the type of harm that is sufficiently direct, using it to infer a negative is a bridge too far. The example should be taken as just that: an example. It should guide the agency's decision-making, but it does not prescribe a strict rule. This is especially true given the regulations' unambiguous use of a legal term of art with a long-established definition.[7]

The U-visa regulations unambiguously adopt the well-established legal meaning for direct and proximate harm, and the court will not defer to UCSIS's interpretation.

      *b.*     *"Direct and Proximate" Does Not Require Physical Presence*

Given that the regulation unambiguously adopts the established legal definition of direct and proximate harm, the court must now determine whether that definition includes a requirement for physical presence. It does not.

Under the CVRA and the MVRA, a victim need not have been physically present at the commission of the crime. United States v. Checora, 175 F.3d 782, 795 (10th Cir. 1999) (holding that a homicide victim's sons who were not present at the time of their father's death had been directly and proximately harmed by the crime—and were therefore victims within the meaning of the statute—"because they ha[d] lost, among other things, a source of financial support"). Courts generally agree that there can be multiple causal steps connecting the criminal act to the victim. United States v. Hackett, 311 F.3d 989, 993 (9th Cir. 2002) ("Although there are multiple links in the causal chain, the district court did not err by finding that [the defendant's]

---

[7] Defendants also argue that Congress's creation of a cap of 10,000 U visas for direct victims per year supports their position. (See Defs. Mem. at 18; Defs. Reply at 8-9.) This is a stretch. While such a cap does indicate that Congress wanted to limit the number of direct victims receiving U visas in any given year, it provides no indication about whether Congress intended that direct victims must always be physically present at the crime scene. Without other, more direct, indicia of Congressional intent, such tenuous evidence is insufficient to overcome the plain meaning of the regulation.

conduct [in aiding and abetting the manufacture of methamphetamine] was directly related to the cause of the fire."). See also United States v. Haggard, 41 F.3d 1320, 1323-24, 1329 (9th Cir. 1994) (finding that the mother of a missing child was a victim of fraud by a state inmate who contacted the FBI falsely claiming to know the location of the child's body and identity of the assailant because the mother's refreshed grief was caused by the defendant's crimes); United States v. Fountain, 768 F.2d 790, 793-94, 800-04 (7th Cir. 1985) (finding that the Department of Labor was a victim where it had provided compensation to guards or estates of guards attacked by federal inmates). As discussed above, the regulation unambiguously adopts the definition of direct and proximate from these statutes; it stands to reason, then, that it does not require physical presence in all cases either.

Further, Plaintiff points to Matter of S-O-C-L, 2015 WL 6735245 (AAO Oct. 22, 2015), a non-precedential decision of the AAO, to illustrate that USCIS does not uniformly apply this physical presence requirement. In that case, the AAO determined that a non-targeted individual was a victim even though he was not present during the murder because he discovered the targeted individual's body in the hallway of his apartment. Id. at *4. Defendants respond that he was actually physically present at the crime because he was present in the immediate aftermath. (Defs. Reply at 14.) This is not, however, how AAO characterized its ruling at the time: in the course of determining whether to presume the applicant had suffered emotional harm, AAO decided not to apply that presumption because "he was not present during the commission of the crime." S-O-C-L, 2015 WL 6735245 at *4. It nonetheless found that, given the circumstances, the applicant had suffered direct and proximate harm. Id. at *6. It is true that this decision has no precedential value; however, it does illustrate that USCIS can apply—and has applied—a more flexible approach to direct and proximate cause than the one it espouses here. S-O-C-L, in

20

fact, demonstrates exactly the kind of inquiry mandated by the regulation: one where a lack of physical presence is considered as a factor weighing against a finding of direct and proximate harm, but where it is not dispositive. USCIS may be correct that, in the majority of situations, a non-targeted individual who is not present at the crime scene does not suffer direct and proximate harm as a result of the crime. But the regulation does not create a requirement of physical presence to be met in every case. Rather, it envisions a case-by-case analysis to determine whether, in this case, for this crime, the harm suffered by the applicant is a direct and proximate harm of the qualifying criminal activity.[8]

Because "an 'alternative reading is compelled by the regulation's plain language [and] by other indications of the [agency's] intent at the time of the regulation's promulgation,'" Thomas Jefferson Univ., 512 U.S. at 512 (quoting Gardebring, 485 U.S. at 430), the court will not defer to USCIS's interpretation. It finds, therefore, that USCIS impermissibly imposed a requirement of physical presence unambiguously foreclosed by the U-visa regulations.

    2.    Indirect victim

Plaintiff also challenges USCIS's determination that she is not an indirect victim. (Compl. ¶ 56.) As previously noted, a direct victim's "alien spouse, children under 21 years of

---

[8] Contrary to Defendants' assertions, this interpretation is consistent with the AG Guidelines. The current Guidelines state that "emotional harm may be presumed in violent crime cases where the individual was actually present during a crime of violence." Attorney General's Guidelines for Victim and Witness Assistance at 9 (2012). However, the Guidelines go on to discuss situations where the individual was not present: "In all other cases, emotional harm should not be presumed in the absence of physical or pecuniary harm, but rather the existence of cognizable or emotional harm should be determined on a factual, case-by-case basis." Id. This sentence makes no sense if, as Defendants argue, the Guidelines support a strict rule that a non-targeted individual may only be a direct victim when they were actually present at the commission of the crime. And as noted above, the 2005 version of the Guidelines merely stated that "a person whose injuries stem only indirectly from an offense is not [a victim]." Attorney General's Guidelines for Victim and Witness Assistance at 10 (2005). It does suggest that a bystander will generally only be considered a victim where they suffer "an unusually direct injury"; this does not foreclose the possibility, however, that someone who is not present may, on occasion, also suffer an unusually direct injury and thereby qualify as a victim. Id. That situation may be even more rare than for an individual who was physically present at a crime, but the AG Guidelines nonetheless provide no basis to disregard the long-standing meaning of "direct and proximate" as discussed above.

age and, if the direct victim is under 21 years of age, parents and unmarried siblings under 18 years of age" may obtain U-visa status as indirect victims if "the direct victim is deceased due to murder or manslaughter, or is incompetent or incapacitated." Id. § 214.14(a)(14)(i). Plaintiff does not argue that she was an indirect victim of murder, as her daughter was over 21 years of age at the time of that murder (Defs. Mem. at 19; see also Compl.). Instead, Plaintiff argues that she should be considered an indirect victim of child endangerment as A.M.'s parent. (See Compl. ¶ 50.) The AAO, however, determined that, as a legal guardian, she did not qualify as a parent; Defendants argue that this was a permissible interpretation as the AAO was relying on definitions of "child" and "parent" contained in the Immigration and Nationality Act (the "INA"), 8 U.S.C. § 1101(b)(1) and (2).[9] (Defs. Mem. at 19.) These definitions apply to "parents" as used in the U-visa provisions of the VTVPA. 8 U.S.C. § 1101(b).

USCIS's interpretation "is not in conflict with the plain language of the statute," so "deference is due." See Nat'l R.R. Passenger Corp., 503 U.S. at 417 (citing K Mart, 486 U.S. at 292). The INA does not explicitly include legal guardians or de facto parents within its definitions of "child" and "parent," and other courts have consistently supported interpretations providing that legal guardians or de facto parents do not qualify as parents within this statutory definition. See, e.g., Castellon-Guzman v. Holder, 334 F. App'x 886, 889 (10th Cir. 2009) (ruling that the petitioner did not have a parent-child relationship within the meaning of the INA even though he was "the sole provider for his minor American-citizen brother and sister"); Moreno-Morante v. Gonzales, 490 F.3d 1172, 1177-78 (9th Cir. 2007) (determining that a

---

[9] In its original denial letter, USCIS stated that Plaintiff was not an indirect victim of child endangerment because she was not a legal guardian at the time of the crime. (See Compl. ¶ 49.) However, that was not the rationale relied on in the final agency decision, and so the court will not consider it while examining USCIS's interpretation. See Lujan, 497 U.S. at 882 ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" (quoting 5 U.S.C. § 704)). The court limits its review to the interpretation espoused in the AAO decision.

grandfather who had legal guardianship of his grandchildren had not established a parent-child relationship under the INA). As USCIS's interpretation is, at the least, a permissible reading of the statute, the court will defer to its determination that Plaintiff does not qualify for a U visa as an indirect victim.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED, and Defendants' motion to dismiss, or, in the alternative, for summary judgment is DENIED. The court therefore sets aside the AAO decision, and REMANDS Plaintiff's petition to the AAO for reconsideration in light of this ruling.

SO ORDERED

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
        March 17, 2019

NICHOLAS G. GARAUFIS
United States District Judge